THE STATE OF OHIO, APPELLEE, *v.* HUGHBANKS, APPELLANT.

[Cite as *State v. Hughbanks,* 99 Ohio St.3d 365, 2003-Ohio-4121.]

(No. 2000–0057—Submitted April 29, 2003—Decided August 20, 2003.)

PFEIFER, J.

{¶ 1} In this appeal, Gary Hughbanks Jr. ("Hughbanks") raises 15 propositions of law. For the reasons that follow, we reject them. We have also independently weighed the aggravating circumstances against the mitigating factors and compared his sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. We affirm the defendant's convictions and sentence of death.

{¶ 2} Around 9:00 p.m. on May 13, 1987, William and Juanita Leeman returned to their home in Springfield Township in Hamilton County, Ohio. Once inside, William Leeman confronted a burglar, who proceeded to kill 55–year–old William and 53–year–old Juanita with a knife.

{¶ 3} These murders went unsolved for ten years. In August 1997, Larry Hughbanks, the defendant's brother, and Gary Hughbanks Sr., the defendant's father, informed police that Hughbanks had murdered the Leemans.

{¶ 4} Hughbanks was tried and convicted of the aggravated murders of the Leemans and sentenced to death. To establish Hughbanks's guilt, the state introduced a confession, testimony that Hughbanks's accurately described the layout of the Leeman home and the Leemans' personal property, and two of Hughbanks's knives, which were linked to the murders.

{¶ 5} Hughbanks had gone to the Leeman home during the evening of May 13, 1987, to commit burglary. After looking through the windows to ensure that no one was home, Hughbanks broke in through a back window. Hughbanks went to the master bedroom and took William's wallet and jewelry from the dresser.

{¶ 6} When the Leemans came into the house, William confronted Hughbanks in a bedroom. Hughbanks attacked William with a knife, stabbed him repeatedly, and then slit his throat. According to Hughbanks's confession, the attack was over in "a matter of seconds." After Hughbanks slit William's throat, he chased Juanita into the living room, grabbed her, and slit her throat.

{¶ 7} Hughbanks washed in the bathroom and left a bloody hand towel in the sink. He then left the house through the back door, ran through the back yard into adjoining woods, and traveled along a creek to a nearby school. Hughbanks was gone by the time police officers arrived.

{¶ 8} After being attacked, Juanita stumbled out the front door of her home. While bleeding profusely, she somehow moved from the patio to the driveway, then down the driveway, before collapsing near the street.

{¶ 9} At approximately 9:25 p.m. that evening, Police Officer Pat Kemper was driving his patrol car when he saw someone lying on the driveway at the Leemans' house "waving [her] arm in a real slow motion * * * to get attention." Kemper noticed that the person was covered in blood. Upon stopping, Kemper asked, "Who did this to you[?]" Juanita was conscious, but when she started to talk, "blood was gurgling out of her throat, and the whole side of her face just fell open * * *." Juanita died of her injuries at the hospital.

{¶ 10} Police officers entered the Leemans' house and found William's body in the master bedroom. There were signs of a violent struggle; part of the bedroom wall was bashed in, a lamp was turned over, and blood was smeared on the wall. There was a pool of blood on the carpet between the bed and the wall and a pool of blood under William's head. The telephone cord had been cut, and open dresser drawers appeared to have been searched.

{¶ 11} A "large puddle of blood" on the living room carpet indicated where Juanita had been attacked. A trail of blood leading out the front door, onto the front porch, and down the driveway showed Juanita's line of travel after the attack.

{¶ 12} Blood smears on an unlocked back screen door suggested that the killer had left that way. On the day after the murders, a police bloodhound tracked the killer's scent using the hand towel Hughbanks had left in the sink. The bloodhound followed the scent out the back door, down a hill, and into the creek that borders the Leemans' back yard. The bloodhound then traveled along the creek for a quarter of a mile before losing the scent near a neighborhood school.

{¶ 13} The police investigation did not uncover any trace evidence, hair fibers, or fingerprints that could identify the killer. Between May 1987 and August 1997, the police checked out "hundreds of leads," but the killer remained unidentified.

{¶ 14} During the summer of 1997, Larry Hughbanks told the police that Gary Hughbanks Jr., his brother, had killed the Leemans. Larry told police that Hughbanks was living in Arizona, but that before leaving, Hughbanks had said, "[I] did it, and * * * threw the knife in some woods." Gary Hughbanks Sr., the defendant's father, soon thereafter went to the police station "to talk * * * about his son murdering the Leemans."

{¶ 15} In August 1997, Larry and Gary Sr. met with John Jay, an investigator with the Hamilton County Prosecutor's Office, and Mark Piepmeier, an assistant county prosecutor. Larry turned over a survival knife with a ball compass on the end of the handle. Larry said that Hughbanks "had thrown that knife in a wooded area back in the early part of 1988 out in Amelia, Ohio, when they lived in a trailer." Gary Sr. also implicated Hughbanks in the Leeman murders.

{¶ 16} Subsequent police interviews of Jerry Shaw, Hughbanks's uncle, and Howard Shaw, Hughbanks's cousin, resulted in additional information implicating Hughbanks as the Leemans' killer. Lisa Leggett, identified as Hughbanks's "ex-common-law wife," provided police with another survival knife with a ball compass on the handle that had belonged to Hughbanks. In May 1987, Leggett and Hughbanks had lived near the Leeman home. According to Leggett, the knife was "left behind by [Hughbanks] when they split."

{¶ 17} In September 1997, Tucson, Arizona police arrested Hughbanks. During a police interview on September 9, 1997, Hughbanks denied any involvement in the Leeman murders. Thereafter, Hughbanks remained in police custody in Arizona pending extradition to Ohio.

{¶ 18} Several days later, on September 16, 1997, Tucson police detectives interviewed Hughbanks again. Hughbanks admitted breaking into the Leemans' house and said that two accomplices had been with him during the burglary. Later, Hughbanks said that a fourth man might have also been at the scene. Hughbanks admitted confronting William in the bedroom after the Leemans arrived home but stated that an accomplice had stabbed William and cut his throat. Hughbanks stated that he did not know where Juanita had been and said that his accomplice had "probably got her first."

{¶ 19} As Hughbanks's interview progressed, Hughbanks acknowledged telling his father, brother, and uncle, "I killed somebody." Hughbanks then said, "I went in to commit a burglary. I got scared. I fought with the guy. * * * And I probably ran after the woman and killed her, too." Hughbanks also admitted that he was by himself when he broke into the home and killed the Leemans. Hughbanks said that he had been "completely surprised" by William and had tried to "get away from him in the bedroom." Hughbanks indicated that he "probably" tried to get away by getting out the window, but said, "I think he pulled me back." Hughbanks stated that he had killed the Leemans with a "military knife," which he had found in an "ammo box" in the Leemans' bedroom closet.

{¶ 20} When asked about Juanita's location during her husband's murder, Hughbanks replied, "Probably behind me, watching me, and then after I cut his throat, she took off running out of the house and I went after her." Hughbanks said that he caught her in the living room and added, "I figured I cut her enough that she—she'd bleed to death."

{¶ 21} Hughbanks admitted that he had kept the knife with him when he fled the scene. Hughbanks stated that after he had left the Leemans' house, he ran towards the woods and creek behind the house. Hughbanks "got the blood off [himself] in the creek" and then followed the creek to Greener School. Later, Hughbanks threw away the costume jewelry that he had taken.

{¶ 22} The grand jury indicted Hughbanks on two counts of aggravated murder. Count 1 charged Hughbanks with the aggravated murder of William Leeman while committing burglary. Count 2 charged Hughbanks with the aggravated murder of Juanita Leeman while committing burglary. The grand jury also indicted Hughbanks for aggravated burglary.

{¶ 23} Each count of aggravated murder contained three identical death penalty specifications: murder for the purpose of escaping detection or apprehension pursuant to R.C. 2929.04(A)(3), murder as part of a course of conduct involving the purposeful killing of two or more people pursuant to R.C. 2929.04(A)(5), and, as the principal offender, murder while committing or attempting to commit aggravated burglary pursuant to R.C. 2929.04(A)(7).

{¶ 24} At trial, Leonard Leeman, the victims' son, testified that to the best of his knowledge, Hughbanks did not know his parents and had never been inside their house prior to the murders. After reading Hughbanks's confession, Leonard testified that Hughbanks accurately described the white Formica breakfast bar in the kitchen, the presence of military photographs of the Leemans' children on the hallway wall, and the location of Afghans in the closet. Moreover, Hughbanks had accurately described the Leeman back yard, the hill leading to the creek, and the path to Greener Elementary School. However, Leonard testified that his parents had not kept any survival knives in their home.

{¶ 25} Detective Kemper pointed out that Hughbanks's confession accurately described the victims' wounds and where in the house the attacks took place.

{¶ 26} Dr. Lee Lehman, who was a deputy coroner for Hamilton County in 1987, performed autopsies on both victims. William had been stabbed 17 times. One stab wound was almost four and one-half inches deep. William died as the result of multiple stab wounds to his head, neck, thorax, and extremities.

{¶ 27} Juanita had a "nine-inch by four-inch area of criss-crossing cuts across her throat * * * [and] through the voice box, or larynx, which would prevent her from screaming or talking." Dr. Lehman concluded that Juanita had died from multiple stab wounds to her head, chest, neck, and extremities.

{¶ 28} Dr. Lehman testified that all of these wounds were caused by a "fairly heavy knife" that was "at least an inch or more in width, and * * * at least four inches in length." State's exhibits 45 and 46, the two knives recovered by police as possible murder weapons, were of a type that could have caused the wounds inflicted on the Leemans. Serological testing of the knives failed to reveal any trace of blood.

{¶ 29} At trial, the defense did not present any evidence.

{¶ 30} The jury convicted Hughbanks as charged and recommended the death penalty. The trial court sentenced Hughbanks to death on each count of

aggravated murder and sentenced him to a prison term of 10 to 25 years for aggravated burglary.

{¶ 31} The court of appeals affirmed the convictions and sentences. The cause is now before this court upon an appeal as of right.

### Pretrial issues

{¶ 32} ***Denial of Bond.*** In his fifth proposition of law, Hughbanks contends that the trial court's denial of a reasonable bond prior to trial violated his constitutional right to assist counsel in the preparation of his defense. We disagree.

{¶ 33} Section 9, Article I of the Ohio Constitution provides: "All persons shall be bailable by sufficient sureties, except for a person who is charged with a capital offense where the proof is evident or the presumption great * * *." It is the trial court's role to determine whether a capital defendant should be admitted to bail. *State ex rel. Reams v. Stuart* (1933), 127 Ohio St. 314, 188 N.E. 393, syllabus.

{¶ 34} Hughbanks argues that the trial court erred in failing to hold an evidentiary hearing to determine whether the proof or presumption warranted a denial of bail. However, Hughbanks never requested such a hearing and thereby waived this issue. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; *State v. Issa* (2001), 93 Ohio St.3d 49, 64, 752 N.E.2d 904.

{¶ 35} Moreover, following conviction, "any error concerning the issue of pretrial bail is moot." *State v. Patterson* (1996), 110 Ohio App.3d 264, 271, 673 N.E.2d 1001. Thus, we overrule the fifth proposition of law.

{¶ 36} ***Funding of defense experts.*** In his first proposition of law, Hughbanks claims that he was not provided with adequate funding for an expert on substance abuse, a coroner, or a crime-scene investigator. In his third and fourth propositions of law, Hughbanks claims that he was not provided with adequate funding for an independent pathologist or a neuropharmacologist.

{¶ 37} In *Ake v. Oklahoma* (1985), 470 U.S. 68, 74, 105 S.Ct. 1087, 84 L.Ed.2d 53, the United States Supreme Court held that the state must provide a psychiatric expert for the defense when the defendant has made a preliminary showing that his sanity will be a significant factor at the trial. Although *Ake* dealt only with a defendant's entitlement to a psychiatric expert, we have recognized that due process may require the state to provide other types of expert assistance to an indigent criminal defendant. *State v. Mason* (1998), 82 Ohio St.3d 144, 149, 694 N.E.2d 932. Moreover, R.C. 2929.024 requires the trial court to provide expert assistance when "reasonably necessary for the proper

representation of a defendant charged with aggravated murder * * *." See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 150, 749 N.E.2d 226.

{¶ 38} In *Mason*, we held that the state must provide an indigent criminal defendant with funds to obtain expert assistance when the defendant has made a particularized showing that (1) there exists a reasonable probability that the requested expert would aid the defense and (2) denial of that expert assistance would result in an unfair trial. Whether the showing has been made is determined by the trial court in the exercise of its sound discretion. *Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus. See, also, Sup.R. 20(IV)(D).

{¶ 39} We find that Hughbanks's claims in his first, third, and fourth propositions of law were waived. Hughbanks never requested that the trial court provide funds for an expert on substance abuse, a coroner, a crime-scene investigator, an independent pathologist, or a neuropharmacologist. The court "need not consider an error" when the complaining party "could have called, but did not call" the matter to the trial court's attention. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. Because there is no plain error, we conclude that the first, third, and fourth propositions of law lack merit.

{¶ 40} Hughbanks never requested funding for any of the five experts and never made a "particularized showing" suggesting a "reasonable probability that the requested expert would aid" in his defense as required by *Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus. Further, the facts, as discussed below, demonstrate that denial of the requested expert did not result in an unfair trial.

{¶ 41} Despite a general assertion in the first proposition of law that Hughbanks needed a crime-scene investigator, a coroner, and an expert on substance abuse, Hughbanks has not explained how these experts would have helped his defense. In the face of overwhelming evidence of Hughbanks's guilt, the defense strategy was to concede his guilt during the trial phase and to contest the appropriateness of a death sentence during the penalty phase.

{¶ 42} Our review of the record shows a thorough, professional, and well-documented police investigation even though ten years had elapsed between the time of the murders and Hughbanks's identification as the murderer. Thus, the defense did not need a crime-scene investigator. Nor is there any reason to believe that an expert on substance abuse would have made any difference to the defense case. Further, since the cause of death was not an issue, it is unclear what value a coroner would have provided to the defense. Under these circumstances, we find that Hughbanks has failed to show a particularized need for

these experts and has not shown how the failure to employ these experts denied him a fair trial. See *State v. Nields* (2001), 93 Ohio St.3d 6, 12, 752 N.E.2d 859 (need for an investigator, crime-scene investigator, and a coroner not established); *Issa*, 93 Ohio St.3d at 63, 752 N.E.2d 904 (crime-scene investigator and general investigator not justified); *Tibbetts*, 92 Ohio St.3d at 151, 749 N.E.2d 226 (investigator, crime-scene investigator, and a coroner not warranted).

{¶ 43} In his third proposition of law, Hughbanks makes the broad assertion that an "independent pathologist could have conducted his own investigation and testing." The coroner examined the victims, and the autopsies were thoroughly documented and photographed. There was no mystery about the cause, manner, or timing of the deaths. Hughbanks has failed to show a particularized need for this expert and has not shown that the lack of an independent pathologist resulted in an unfair trial. See *Nields*, 93 Ohio St.3d at 12, 752 N.E.2d 859 (need for an independent pathologist not established); *Issa*, 93 Ohio St.3d at 63, 752 N.E.2d 904 (forensic pathologist not justified); *Tibbetts*, 92 Ohio St.3d at 151, 749 N.E.2d 226 (independent pathologist not required).

{¶ 44} In his fourth proposition of law, Hughbanks claims that a neuropharmacologist could have conducted an analysis and provided an opinion on the effects of his alcohol and drug consumption at the time of his confession. However, Hughbanks's confession to police on September 16, 1997, was made after he had been in continuous police custody for one week. Moreover, nothing indicates that Hughbanks was under the influence of drugs or alcohol at the time of his confession, and he denied having taken "any drugs or medication that morning." Thus, a neuropharmacologist would not have helped the defense. Since counsel at trial never suggested that they needed further assistance from a neuropharmacologist, no "particularized showing" was made.

{¶ 45} Hughbanks also claims that a neuropharmacologist could have presented mitigating evidence for the jury's consideration during the penalty phase although he fails to specify the nature of such evidence. Again, this claim is speculative. Moreover, the trial court provided Hughbanks with funds for a neuropsychologist, and two psychiatrists testified as defense witnesses during mitigation. These experts could have advised the defense counsel about how drugs and alcohol had affected Hughbanks's mental state.

{¶ 46} Counsel had "alternative devices that would fulfill the same functions as the expert assistance sought." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus. See *State v. Smith* (1991), 61 Ohio St.3d 284, 288–289, 574 N.E.2d 510 (pharmacologist not justified because several mental health professionals appointed by the court could explain how drugs and alcohol affected the defendant); *Nields*, 93 Ohio St.3d at 12, 752 N.E.2d 859 (need for a neuropharmacologist not established because other

experts were available); *Tibbetts*, 92 Ohio St.3d at 151, 749 N.E.2d 226 (neuropharmacologist not required because defense had already allotted funds for a forensic psychiatrist and a clinical psychologist).

{¶ 47} As an alternative argument in his third and fourth propositions of law, Hughbanks claims that his counsel provided ineffective assistance of counsel by failing to request funds for such professionals. Reversal of convictions on grounds of ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 48} However, trial counsel were not deficient for failing to make such requests because the trial court would have had no basis to grant the motions, as discussed. See *Issa*, 93 Ohio St.3d at 68, 752 N.E.2d 904 (failure to request funds to hire an investigator not ineffective assistance of counsel).

{¶ 49} Based on the foregoing, we reject the first, third, and fourth propositions of law.

{¶ 50} *Voluntariness.* In his tenth proposition of law, Hughbanks argues that the waiver of his *Miranda* rights and his statements and confessions to the police were involuntary. Hughbanks claims that because police were aware of his psychiatric problems and drug use, the police were obligated to have him evaluated by a competent mental health professional before advising him of his rights and interviewing him. Alternatively, Hughbanks argues that the police should have, sua sponte, provided him with a lawyer.

{¶ 51} On September 9, 1997, Detective Kemper and William Fletcher, an investigator with the Hamilton County Prosecutor's Office, interviewed Hughbanks while he was in police custody in Tucson. Fletcher advised Hughbanks of his *Miranda* rights before beginning the interview. Hughbanks also read a copy of his *Miranda* rights and signed a written waiver.

{¶ 52} In response to a question asked by Fletcher, Hughbanks denied taking any drugs or medication on the morning of the interview. Moreover, Fletcher observed nothing in Hughbanks's comments or behavior that led him to believe that Hughbanks was under the influence of drugs or alcohol during the interview. When asked about his mental history, Hughbanks told Fletcher that he had "conferred with a psychiatrist off and on" over a number of years. Hughbanks stated that Dr. Bernard DeSilva, a psychiatrist from Cincinnati, had treated him. Police did not attempt to call Dr. DeSilva before completing their interview. The police interview lasted several hours; Hughbanks denied any involvement in the murders.

{¶ 53} Following this initial interview, a Tucson detective, Millstone, administered a polygraph examination to Hughbanks.[1] The detective advised Hughbanks of his *Miranda* rights and obtained Hughbanks's consent to take the polygraph prior to the test.

{¶ 54} During the polygraph examination, Hughbanks denied committing the murders. However, results of Hughbanks's polygraph were inconclusive because of his lack of physiological response. According to the detective, Hughbanks showed "very little reaction to anything in the galvanic skin response, the pulse, blood pressure readings. Everything was very, very flat which is consistent with drug use." Hughbanks said that he had injected crystal methamphetamine into his body that morning and showed Millstone a small bruise on his inner arm that was the injection site.

{¶ 55} After the September 9 polygraph test, Hughbanks remained in Tucson in police custody pending extradition to Ohio for the murders. On September 16, 1997, at the request of Hamilton County authorities, Tucson detectives sought to give another polygraph test to Hughbanks. Hughbanks waived his rights and signed a consent form.

{¶ 56} During the pretest interview, Hughbanks stated that he was in good physical condition and had slept well the previous evening, having gotten eight or nine hours of sleep. Hughbanks disclosed that he had been treated by Dr. DeSilva for severe depression and a bipolar disorder. He also stated that he had been an inpatient at psychiatric hospitals "several different times" over a 15–year period, the last time being six or seven years earlier. Hughbanks told the polygraph administrator that he had been prescribed Lithium, Zoloft, and Trazadone to treat his mental condition but had discontinued taking medication about two years before. Hughbanks also stated that he had not been receiving psychiatric care during the previous year.

{¶ 57} To the polygraph administrator, Hughbanks "appeared to be normal * * * that day. He said he hadn't taken drugs recently or in the past 24 hours." Another detective present during the polygraph examination agreed that Hughbanks did not appear to be high or under the influence of any drugs. The detectives made no attempt to contact a psychiatrist about Hughbanks's mental condition prior to administering the polygraph examination.

{¶ 58} Polygraph test results showed that Hughbanks was deceptive, and detectives confronted Hughbanks with the test results. Hughbanks eventually admitted that he had committed the murders.

---

1. Testimony about the polygraph exam was not presented to the jury.

{¶ 59} A court, in determining whether a pretrial statement is involuntary, "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Mason*, 82 Ohio St.3d at 154, 694 N.E.2d 932, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. The same considerations apply to whether Hughbanks voluntarily waived his rights. *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738 N.E.2d 1208.

{¶ 60} Hughbanks acknowledges that he was advised of his rights and waived those rights before making a statement to the police. However, Hughbanks contends that prior to questioning, the police failed to consult a psychiatrist to find out whether his decision to waive his rights and answer police questions was "truly voluntary." Alternatively, Hughbanks claims that the police should have, sua sponte, found a lawyer to represent him.

{¶ 61} A defendant's mental condition is but one factor in the totality of circumstances to be considered in determining voluntariness. A defendant's mental condition may be a "significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " (Citation omitted.) *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473. See *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844.

{¶ 62} The police officers were not required to consult a psychiatrist or have Hughbanks evaluated by a psychiatrist to ensure that his waiver of rights and his statements were the product of his free will. *Connelly* rejected the premise that voluntariness of a confession depended on notions of "free will." *Connelly*, 479 U.S. at 170, 107 S.Ct. 515, 93 L.Ed.2d 473. Rather, "voluntariness * * * has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Id. See *Coe v. Bell* (C.A.6, 1998), 161 F.3d 320, 341; *United States v. Santos* (C.A.1, 1997), 131 F.3d 16, 19.

{¶ 63} The police officers never subjected Hughbanks to threats or physical abuse or deprived him of food, sleep, or medical treatment. Moreover, the police interview and polygraph testing of Hughbanks on September 16 lasted only several hours. We find no evidence of police coercion or overreaching that might show Hughbanks's confession to be involuntary. See *State v. Eley* (1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640.

{¶ 64} Hughbanks's disclosures about his mental condition during the pretest interview on September 16 undermine his claim that his *Miranda* waiver and his subsequent confession were involuntary. During his pretest interview, Hugh-

banks informed police that he had not been hospitalized for psychiatric treatment for several years, was no longer receiving psychiatric treatment, and had discontinued taking medication approximately two years earlier. Hughbanks's tape-recorded interview on September 16 indicates that he was alert and responsive to police questioning and that he was not suffering from any apparent mental problems.

{¶ 65} Finally, Hughbanks's injection of crystal methamphetamine prior to his first interview on September 9 did not affect the voluntariness of his September 16 confession. Hughbanks remained in police custody between September 9 and 16. The detectives who interviewed Hughbanks on September 16 stated that he appeared normal. Moreover, lines on charts from Hughbanks's polygraph examination on September 16 were "no longer flat line, he was responsive [and] reacting to the questions." Hughbanks stated that he had not been taking any drugs recently or within the previous 24 hours. We find no evidence that Hughbanks's drug use on September 9 had any impact on the voluntariness of his confession or his waiver of his *Miranda* rights a week later.

{¶ 66} In conclusion, the totality of the circumstances shows that Hughbanks voluntarily waived his *Miranda* rights and that his confession to police was voluntary. Moreover, the police officers had no obligation, sua sponte, to supply Hughbanks with a lawyer or consult a psychiatrist prior to questioning him, nor did their failure to do so impact the voluntariness of his confession or the waiver of his *Miranda* rights. Thus, we overrule the tenth proposition of law.

{¶ 67} In his 11th proposition of law, Hughbanks argues that his counsel were ineffective by litigating the motion to suppress his pretrial confession without the assistance of supportive psychiatric testimony.

{¶ 68} Hughbanks contends that his motion attacking the voluntariness of his confession or the waiver of his *Miranda* rights was "doomed to failure" without supportive expert testimony about his mental condition at the time he waived his rights and provided his confession to the police. Hughbanks suggests that his counsel could have called Dr. DeSilva and Dr. Sagi Raju, two psychiatrists who testified for the defense during mitigation, to testify during the hearing on the motion to suppress.

{¶ 69} We find that counsel's decision not to present psychiatric testimony during the hearing on the motion to suppress was not deficient performance pursuant to *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. As discussed in the tenth proposition of law, mental illness, absent coercive police activity, is not a sufficient basis for excluding Hughbanks's statement. The voluntariness of his statement depends on whether the police engaged in coercion and misconduct and not whether Hughbanks was mentally ill. See *Connelly,* 479 U.S. at 164, 107 S.Ct. 515, 93 L.Ed.2d 473. Neither Dr. DeSilva nor Dr. Raju

testified during mitigation that Hughbanks was incapable of making a voluntary statement. Moreover, their description of Hughbanks's mental problems does not support a conclusion that he was unable to voluntarily make a statement or waive his *Miranda* rights. Therefore, we reject the 11th proposition of law.

### Trial issues

{¶ 70} ***Gruesome photographs.*** In his sixth proposition of law, Hughbanks argues that the trial court erred in admitting gruesome photographs of the victims. However, Hughbanks fails to specify what photographs were objectionable. The record shows that, over defense objection, the trial court admitted crime-scene photographs of William's body, three autopsy slides of William, and three autopsy slides of Juanita.

{¶ 71} In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of the photographs outweighs the danger of material prejudice to the accused. *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267. `Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 72} The crime-scene photographs showed different angles of William's body at the foot of his bed. These photos depicted the crime scene, illustrated the testimony of the detective at the scene, and helped to prove Hughbanks's intent. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 288, 754 N.E.2d 1150; *State v. Goodwin* (1999), 84 Ohio St.3d 331, 342, 703 N.E.2d 1251.

{¶ 73} One autopsy photograph of William's torso shows where he had been stabbed. Two others present closeups of William's face and neck and show where his throat had been slit. Autopsy photographs of Juanita present closeups and different angles of her face and neck and show how her throat had been slit. These exhibits depicted the victims' wounds, illustrated the coroner's testimony on the cause of death, and helped prove Hughbanks's intent. See *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 36; *Mason*, 82 Ohio St.3d at 158, 694 N.E.2d 932.

{¶ 74} We find that the trial court could have reasonably found that the probative value of each photograph and autopsy slide outweighed any prejudicial impact on the jury. Thus, the trial court did not abuse its discretion in admitting these photographs and autopsy slides. We reject the sixth proposition of law.

{¶ 75} ***Sufficiency and weight of the evidence.*** In his second proposition of law, Hughbanks challenges both the sufficiency and the manifest weight of the evidence.

{¶ 76} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259–260, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 77} Hughbanks provides no explanation on how the evidence was insufficient to establish his guilt. At trial, Hughbanks offered no defense to the charges and conceded his guilt. Indeed, the defense counsel informed the jury, "[Y]ou're not going to have any trouble with a guilty verdict on this."

{¶ 78} Hughbanks's confession to the police, his confession to family members, and other corroborating evidence strongly support the jury's verdict. Hughbanks's confession accurately described the layout of the Leemans' house, the location of personal property found inside, and the locations where the attacks took place. Moreover, two of Hughbanks's survival knives, one of which was the probable murder weapon, were introduced into evidence. Thus, there was sufficient evidence for the jury to find, beyond a reasonable doubt, that Hughbanks murdered the Leemans during a burglary.

{¶ 79} Finally, we reject Hughbanks's contention that his conviction was against the manifest weight of the evidence. "Pursuant to R.C. 2953.02, we can overturn a conviction as being against the manifest weight of the evidence in a capital case, but only where the crime was committed after January 1, 1995." *State v. Sanders* (2001), 92 Ohio St.3d 245, 254, 750 N.E.2d 90; see, also, *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 83. The Leemans were murdered in May 1987. Based on the foregoing, we reject the second proposition of law.

{¶ 80} ***Ineffective assistance of counsel.*** In his 12th proposition of law, Hughbanks argues that his counsel provided ineffective assistance by failing to call as witnesses his family members who had implicated him in the murders. Hughbanks claims that they should have been subject to cross-examination. We reject this claim.

{¶ 81} First, Hughbanks has not supported his claim that the failure to call family members represents deficient performance, as required by *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. The totality of the record before us indicates that the testimony of family members would have only underscored Hughbanks's guilt. Detective Kemper testified that Larry Hughbanks had told police that Hughbanks admitted killing the Leemans. Investigator Jay testified that Larry provided police with Hughbanks's survival knife that was introduced as a possible murder weapon. According to other testimony, Hughbanks's father, uncle, and cousin provided information to the police implicating Hughbanks in the

Leeman murders. Additional testimony indicated that Lisa Leggett, Hughbanks's "ex-common-law wife," provided police with a survival knife that Hughbanks owned, as another possible murder weapon.

{¶ 82} "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490, 739 N.E.2d 749; see, also, *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 118. Trial counsel's decision not to call any family members as witnesses was reasonable given that Hughbanks's confession had already been introduced at trial and given the fact that that testimony would have been repetitive. Moreover, the trial counsel informed the court that the defense was not calling any family members as witnesses, as a matter of "trial strategy."

{¶ 83} We also conclude that the decision to forgo calling family members was not prejudicial. See *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Such testimony would likely have strengthened the state's case, since the jury would have viewed Hughbanks's confession to family members as overwhelming evidence of his guilt. We conclude that Hughbanks's counsel were not ineffective. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. We reject the 12th proposition of law.

### Penalty phase issues

{¶ 84} *Other acts.* In his 13th proposition of law, Hughbanks argues that he was denied a fair trial when the prosecutor was allowed to cross-examine a defense psychiatrist during the penalty phase about Hughbanks's previous imprisonment, his domestic violence, and his failure to support his children. Hughbanks claims that the prosecutor's cross-examination elicited "other acts" testimony prohibited by Evid.R. 404(A) and (B).

{¶ 85} During the penalty phase, the defense presented the videotaped testimony of Dr. DeSilva, a defense psychiatrist. Dr. DeSilva testified that he had diagnosed Hughbanks with a "[s]chizoaffective disorder" and a "bipolar disorder." Dr. DeSilva discussed Hughbanks's family history of mental disorders, the drugs prescribed to treat Hughbanks's mental problems, and Hughbanks's hospitalization for mental problems.

{¶ 86} On direct examination, Dr. DeSilva testified that Hughbanks's bipolar illness was "inherent" and not caused by his "drug use alone." Dr. DeSilva also testified that Hughbanks's suicide attempts, delusions, and hallucinations were not simply a function of his drug use or alcohol abuse because "the symptoms persist."

{¶ 87} During cross-examination, Dr. DeSilva testified that he would expect Hughbanks's aberrant and unpredictable behavior to continue even after he had

ceased to consume alcohol and drugs for a long period of time. Over objection, the prosecution asked Dr. DeSilva, "Are you aware he's been incarcerated on several occasions in the past?" Dr. DeSilva mentioned that he was aware of a prior DUI and stated, "I think once [Hughbanks] was in prison, yes, sir." The prosecutor then asked Dr. DeSilva, "Are you aware of him having any major difficulties like this in prison when he's off of this alcohol and drugs?" Dr. DeSilva replied that he did not have any knowledge about Hughbanks's behavior in confinement. Over further objection, Dr. DeSilva was asked whether he was aware that Hughbanks had been incarcerated for approximately nine months while awaiting trial. Dr. DeSilva answered, "Yes." The prosecutor then asked, "Are you aware of any major problems he's had while incarcerated, * * * this bipolar disorder rearing its ugly head and causing him to act out of character?" Dr. DeSilva replied, "I have not been informed of anything of that nature."

{¶ 88} Evid.R. 611(B) provides that cross-examination shall be permitted on all relevant matters and on matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre* (1983), 6 Ohio St.3d 140, 145, 6 OBR 197, 451 N.E.2d 802; *Treesh*, 90 Ohio St.3d at 480, 739 N.E.2d 749. Moreover, Evid.R. 705 permits the court, the jury, and adverse counsel to know what facts or data in evidence form the basis for the expert's opinion.

{¶ 89} Dr. DeSilva's testimony that Hughbanks's mental disorder was "inherent" and that his aberrant behavior, delusions, and hallucinations could not be explained by drug and alcohol abuse alone opened the door to cross-examination testing this conclusion. See *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 98; *Maurer*, 15 Ohio St.3d at 263, 15 OBR 379, 473 N.E.2d 768 ("[a] witness may be properly cross-examined as to all relevant facts developed by the examination in chief"). Thus, the state could properly cross-examine Dr. DeSilva about Hughbanks's behavior in the controlled setting of a prison environment, after the effect of drugs or alcohol had worn off. See *State v. Gowdy* (2000), 88 Ohio St.3d 387, 396, 727 N.E.2d 579. Dr. Nancy Schmidtgoessling, a psychologist, testified on rebuttal that she interviewed Hughbanks after he had been incarcerated for a couple of months and that "nothing" suggested that "there was anything wrong with him."

{¶ 90} On direct examination, Dr. DeSilva described problems between Hughbanks and other family members. Dr. DeSilva described a fight where Hughbanks's mother "struck him in the face * * * to control his behavior at the time. * * * And then he tried to hurt her in return."

{¶ 91} Dr. DeSilva was cross-examined regarding his conversations with a clinic's personnel about Hughbanks's diagnosis. The prosecutor asked Dr. DeSilva whether there was an "indication of homicidal threats and that he's not violent or dangerous?" Dr. DeSilva answered, "In my office, the time I seen [sic] him, he has never been violent, never dangerous, never any homicidal threat." Over defense objection, the prosecutor then asked, "How about domestic violence convictions, are you aware of that?" Dr. DeSilva replied, "[T]here was domestic violence, I was aware of at different times, yes."

{¶ 92} The defense opened the door to cross-examining Dr. DeSilva about domestic violence, since Dr. DeSilva mentioned during direct examination that Hughbanks had struck his mother. See *Gowdy*, 88 Ohio St.3d at 395, 727 N.E.2d 579. Moreover, cross-examination about Dr. DeSilva's awareness of Hughbanks's domestic violence convictions was relevant to Dr. DeSilva's comment that Hughbanks was not violent or dangerous. Evid.R. 611(B) and 705. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 335, 738 N.E.2d 1178.

{¶ 93} During this cross-examination, the prosecutor inquired about Hughbanks's relationship with his children. At one point, the prosecutor asked whether Hughbanks had "had any interaction with them or supported them in any fashion[.]" Dr. DeSilva replied that Hughbanks had tried to support his children and "was unhappy that he couldn't do anything more for the children." In a followup question, the prosecutor asked, "Did [Hughbanks] ever, to your knowledge, manifest that in anyway by supporting them or getting a job to try to support them * * *?" Dr. DeSilva replied, "He tried. He was * * * not the world's best person at holding a job."

{¶ 94} Because Hughbanks failed to object at trial to evidence about his failing to provide child support, he waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. See Crim.R. 15(G) ("Objections to receiving in evidence a deposition or a part thereof shall be made as provided in civil actions").

{¶ 95} The cross-examination of Dr. DeSilva about Hughbanks's failure to provide child support was irrelevant and tended to portray Hughbanks in a negative light. Nevertheless, we find that it did not result in outcome-determinative plain error. Dr. DeSilva's reference to Hughbanks's child support was isolated and of minor significance given the gravity of the offenses charged against Hughbanks. See *Tibbetts*, 92 Ohio St.3d at 161, 749 N.E.2d 226 (erroneous admission of defendant's failure to provide child support deemed harmless beyond a reasonable doubt).

{¶ 96} Based on the foregoing, we reject the 13th proposition of law.

{¶ 97} ***Cross-examination of expert witness.*** In his 14th proposition of law, Hughbanks claims that the prosecutor improperly cross-examined Dr. DeSilva

during the penalty phase by asking him whether Hughbanks met the legal definition of insanity at the time of the murders. Hughbanks did not object to this testimony at trial and thus waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 98} During cross-examination at the penalty phase, Dr. DeSilva was asked, "Are you familiar with the guidelines in Ohio for insanity, and one of the guidelines is your inability to conform your acts to the law?" Dr. DeSilva replied, "Yes, it's a legal guideline." Dr. DeSilva was then asked, "And are you aware that he was actually recently examined by Dr. Schmidtgoessling for that very subject * * *?" Dr. DeSilva said that he was "not aware of that." Following this exchange, Dr. DeSilva was asked, "Are you aware that Dr. Schmidtgoessling's finding was that there's nothing at all to suggest during the time of this offense * * * that the defendant was suffering from any type of mental disease or defect, or that he was unable to know the wrongfulness of his alleged acts?" Dr. DeSilva said, "[T]hat's not what we discussed * * * and * * * if she made that statement, I would say that statement is not quite accurate."

{¶ 99} Hughbanks argues that the prosecution improperly cross-examined Dr. DeSilva about Hughbanks, since sanity was not at issue during the penalty phase. We reject this argument. Hughbanks raised his mental disorder as an R.C. 2929.04(B)(3) mitigating factor. Thus, cross-examination of Dr. DeSilva about Hughbanks's sanity was relevant, since the "issues involved are similar: whether a 'mental disease or defect' existed and, if so, whether and to what degree it may have impaired his cognition and volition." *State v. Cooey* (1989) 46 Ohio St.3d 20, 33, 544 N.E.2d 895; see, also, *State v. Hill* (1996), 75 Ohio St.3d 195, 203, 661 N.E.2d 1068. Accordingly, we reject the 14th proposition of law.

{¶ 100} ***Jury verdict as a recommendation.*** In his 15th proposition of law, Hughbanks claims that the trial court's instructions violated *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, by indicating that the jury's verdict was merely a recommendation.

{¶ 101} Before voir dire and over defense objection, the trial court instructed the jury that "in the sentencing phase, * * * you'll hear information, you'll deliberate, and basically you will come back to me, the Court, and tell me the sentencing recommendation. But please understand, we use that word, recommendation, but whatever sentencing recommendation that you give me will be the sentencing in regards to this particular case." The trial court's penalty-phase instructions stressed that the jury should "assume that the recommendation shall be the sentence of this Court."

{¶ 102} We have repeatedly rejected similar complaints alleging a *Caldwell* violation. See, e.g., *State v. Durr* (1991), 58 Ohio St.3d 86, 93, 568 N.E.2d 674; *State v. Davie* (1997), 80 Ohio St.3d 311, 326–327, 686 N.E.2d 245. In this case,

there was no *Caldwell* violation, since the trial court's instructions accurately stated the law, emphasized the jury's responsibility to impose a sentence, and did not induce reliance on the prospect of appellate review. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 109. We reject the 15th proposition of law.

### Constitutional issues

{¶ 103} In his seventh proposition of law, Hughbanks argues that requiring that mitigating factors be proven by a preponderance of the evidence violates the Ohio and United States Constitutions. His claim is without merit. *Delo v. Lashley* (1993), 507 U.S. 272, 275–276, 113 S.Ct. 1222, 122 L.Ed.2d 620. See *Jenkins*, 15 Ohio St.3d at 171, 15 OBR 311, 473 N.E.2d 264. In any event, the trial court instructed the jury during the penalty phase that "the State has the burden of proving beyond a reasonable doubt that the aggravating circumstances * * * outweigh the factors in mitigation. Gary Hughbanks does not have any burden of proof." We reject the seventh proposition of law.

{¶ 104} In his eighth proposition of law, Hughbanks challenges the trial court's instructions on reasonable doubt during the penalty phase of the trial. We summarily reject this challenge. See *State v. Goff* (1998), 82 Ohio St.3d 123, 131–132, 694 N.E.2d 916; *Issa*, 93 Ohio St.3d at 69, 752 N.E.2d 904.

{¶ 105} In his ninth proposition of law, Hughbanks disputes the constitutionality of Ohio's death penalty statutes. We summarily reject this challenge. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *Jenkins*, 15 Ohio St.3d at 179, 15 OBR 311, 473 N.E.2d 264.

### Independent Sentence Evaluation

{¶ 106} The evidence established beyond a reasonable doubt that Hughbanks murdered William and Juanita Leeman to escape detection or apprehension pursuant to R.C. 2929.04(A)(3), as a course of conduct pursuant to R.C. 2929.04(A)(5), and, as the principal offender, while committing or attempting to commit aggravated burglary pursuant to R.C. 2929.04(A)(7). The trial court merged the (A)(3) and (A)(7) specifications prior to imposing sentence.

{¶ 107} Hughbanks called five mitigation witnesses, made an unsworn statement, and introduced documentary evidence for the jury's consideration.

{¶ 108} Dr. Raju treated Hughbanks when he was hospitalized for psychotic behavior in June 1986. Hughbanks "complained about hearing voices and noises telling him to kill himself. And he also express[ed] some homicidal thoughts." Hughbanks mentioned "multiple problems at home" and admitted "drinking alcohol for the past month every day."

{¶ 109} During his hospitalization, Hughbanks expressed feelings of "helplessness and hopelessness." He stated that he could not "control the fear of losing self control and hurting himself or somebody else." Hughbanks was hospitalized for 14 days and was treated with Lithium and Thorazine. Hughbanks's final diagnosis was that he suffered from a "major affective disorder and bipolar disorder, which is of manic episode [and] drug and alcohol abuse."

{¶ 110} Hughbanks was readmitted to the hospital in August 1986 following "an overdose of drugs that were prescribed to him." He was hospitalized for fewer than three days and was treated with "psychotropic medication as well as some medication for agitated behavior."

{¶ 111} Dr. DeSilva treated Hughbanks for "about a five-year period" during the 1980s. Dr. DeSilva also had treated Gary Sr. a couple of years prior to his treatment of Hughbanks.

{¶ 112} Gary Sr. was diagnosed and treated for a "mixture of paranoid schizophrenia with some schizoaffective features." Gary Sr.'s mental disorders resulted in his hospitalization on a couple of occasions during the late 1970s and early 1980s.

{¶ 113} Dr. DeSilva testified that Gary Sr.'s illness had a "[v]ery serious impact" on his wife and children and that "he could never remember the relationship being very good * * *." Hughbanks was abused by his father and was sometimes "beaten" or "threatened with beatings." Moreover, Gary Sr.'s illness may have affected the defendant, since the diagnosis of schizophrenia "runs in families. There is a genetic tendency and sometimes a familial augmentation [and] anywhere from three to five percent of the population is genetically prone to schizophrenia."

{¶ 114} Hughbanks was diagnosed with a "[s]chizoaffective disorder" and "[b]ipolar Type II" illness with "intermittent concomitant drug abuse and alcohol abuse." Hughbanks's bipolar disorder was identified by his "variations in mood * * * from a manic phase and then * * * fairly fast to the depressed phase." Dr. DeSilva testified that Hughbanks experienced hallucinations similar to his father's. Hughbanks saw "something very much like * * * what his father saw, * * * a red-eyed devil or a red-eyed man."

{¶ 115} Dr. DeSilva testified that "most of [Hughbanks's] hospitalizations and interventions were because of suicidal intent." Hughbanks "really wanted to die * * * [since] he felt that he could not handle life as it was." Hughbanks was treated with Lithium, but he "could not stay on it long enough." He was also treated with Chloroform, Thorazine, and Antabuse.

{¶ 116} During cross-examination, Dr. DeSilva testified that there was "no evidence" that Hughbanks has an organic brain disorder or is mentally retarded.

Dr. DeSilva stated that Hughbanks's bipolar disorder was responsible for his aberrant behavior, excessive reactions, and flamboyant statements. Dr. DeSilva testified that he would expect Hughbanks's aberrant behavior to continue even after he was off alcohol and drugs for a long period of time.

{¶ 117} Under cross-examination, Dr. DeSilva disputed the diagnosis of a Dr. Feuss that Hughbanks suffered from an antisocial personality disorder and not from schizoaffective or bipolar disorders. Dr. DeSilva disagreed with Dr. Nancy Schmidtgoessling's findings that, at the time of the 1987 murders, Hughbanks was not suffering from any type of mental disease or defect and was able to appreciate the wrongfulness of his acts. Dr. DeSilva disagreed with Dr. Schmidtgoessling's diagnosis even though Dr. Schmidtgoessling's more recent evaluation of Hughbanks included intelligence tests and the MMPI–II. Intelligence testing showed that Hughbanks had a full-scale IQ of 82.

{¶ 118} Records show that Dr. DeSilva told the court clinic that Hughbanks was "crazy before he was born" and "isn't competent to stand trial." However, Dr. DeSilva acknowledged that he had not seen Hughbanks in at least a year when he stated this opinion.

{¶ 119} Larry Kramer, Hughbanks's uncle, lived near the Hughbanks family while Hughbanks was growing up. Kramer and Gary Sr. also worked together. Kramer stated that the Hughbanks family "always had financial problems" and "[m]any a time they would cook on a Coleman stove because their electricity would be turned off." However, Gary Sr. had a "fancy for cars" and would drive a nice car even if the family did not have enough to eat.

{¶ 120} Dr. DeSilva treated Kramer for paranoid schizophrenia. Kramer introduced Gary Sr. to Dr. DeSilva, who treated Gary Sr. for his mental problems. Kramer felt that Hughbanks's mother also had a mental disorder. She experienced a "lot of depression," and she's "had a very pitiful life." During cross-examination, Kramer testified that Hughbanks's mother loved Hughbanks very much, never physically abused him, and taught him the difference between right and wrong.

{¶ 121} Larketa Ann Hughbanks, Hughbanks's younger sister, grew up with Hughbanks and another brother. Larketa and her siblings had very few friends because if "[Gary Sr.] didn't like them, of [sic] if he disapproved of them, they weren't to come back around." Gary Sr. often made Larketa and her siblings "go to bed at 5:30 in the afternoon or 6 o'clock." Larketa and her brothers "used to call him the Warden."

{¶ 122} Larketa testified that Hughbanks tried to kill himself on several occasions by taking an overdose of pills, slitting his wrist, and trying to jump off a balcony. Hughbanks also talked about hearing and seeing things. For example, Hughbanks once described seeing a black figure "with red piercing eyes."

Larketa stated that Hughbanks becomes "very irate" and "not normal when he's not on his Lithium." However, "[w]hen he's on the Lithium, he's very mellow. He can handle things."

{¶ 123} Evangeline Hughbanks, the defendant's mother, was 16 years old when she married Gary Sr., who was then 15, in 1965. Evangeline had three children, including Hughbanks, who was born on August 29, 1966. Hughbanks was born with a "ruptured omphalocele, which is an open stomach." Hughbanks underwent surgery and was almost two months old before leaving the hospital.

{¶ 124} Evangeline testified that Gary Sr. was a "very abusive" husband and used to beat her. Gary Sr. never physically abused Hughbanks or his siblings. Evangeline disciplined the children, including spanking them and using the belt on them.

{¶ 125} Larry Hughbanks, the defendant's younger brother, has had numerous legal problems. He has stolen guns, been sentenced as a pedophile, and spent approximately six years in prison.

{¶ 126} In making a final plea for Hughbanks, Evangeline said, "[P]lease don't kill my son. It hasn't been easy for him, for me, for my children. Please don't kill him."

{¶ 127} During cross-examination, Evangeline testified that Hughbanks had relationships with three women. He married Brenda Williams in August 1984, and their relationship lasted four months. Hughbanks next had a relationship with Lisa Vanselow, and "they had four children together." He then had a relationship with Kelly Richards, and they had a little boy. According to Evangeline, Hughbanks beat each of these women.

{¶ 128} In his unsworn statement, Hughbanks told the jury, "[Y]ou did the right thing in finding me guilty." He told the Leeman family, "I'm sorry it happened. I wish it would have never happened. And if my life being taken gives you comfort of your mother and father being gone, then so be it. It's out of my hands. I can't undo what's been done, and I will not beg for my life, because I don't deserve that."

{¶ 129} Further, Hughbanks stated, "I have a mental illness, but I will not use that as the blame for what has happened." Finally, Hughbanks said, "I was the only one that night, so you need not worry about anyone else being out there. I did this. And there's no, no excuse I can give in the world for saying that it was right. None."

{¶ 130} *Rebuttal evidence.* Dr. Schmidtgoessling, a psychologist at the Community Diagnostic and Treatment Center, performed a sanity evaluation on Hughbanks. She interviewed Hughbanks, conducted psychological testing, an IQ test, and reviewed his jail records. During her initial interview of Hughbanks on

November 24, 1997, he "repeatedly stated * * * he had not done this offense." Dr. Schmidtgoessling testified that "[h]e was very clear in his speech. He was very well organized in his thoughts. He did not appear to be particularly high in his mood or dejected. * * * [T]here was nothing to suggest that there was anything wrong with him." After conducting her evaluation, Dr. Schmidtgoessling concluded that Hughbanks was sane at the time of the offenses.

{¶ 131} Dr. Schmidtgoessling visited Hughbanks on May 23 and May 29, 1998, just prior to his trial. Hughbanks stated "that he was not having any hallucinations, did not have any bizarre thoughts, his mood was stable." During these interviews, Hughbanks admitted committing the murders because he was frightened and angry. According to Dr. Schmidtgoessling, Hughbanks said that Mr. Leeman had put him in this position, "that is to say, he was caught inside this house accosted. And he said that's the reason he fought back and stabbed Mr. Leeman." Hughbanks explained that he killed Mrs. Leeman because "she had seen him and could identify him."

{¶ 132} Dr. Schmidtgoessling diagnosed Hughbanks as having "some sort of a mood disorder, a possible substance abuse and dependence, and a character disorder." She testified that other doctors may have diagnosed Hughbanks with more serious mental disorders while he was still under the influence of illicit drugs. However, Dr. Schmidtgoessling testified that Hughbanks was "not delusional, was not bizarre in thought. He said that he was stable at the time that these things happened."

{¶ 133} On cross-examination, Dr. Schmidtgoessling agreed that immediately before trial, Hughbanks was tearful, upset, and "repeatedly stated that he was sorry he had done this." Dr. Schmidtgoessling also agreed that Hughbanks "does much better in a structured environment, one in which there [are] no substances."

### Sentence evaluation

{¶ 134} We find nothing in the nature and the circumstances of the offenses to be mitigating. Hughbanks murdered William Leeman after William surprised Hughbanks in the act of burglarizing the Leeman home. According to Hughbanks's confession, he attempted to avert confrontation. Hughbanks explained that he killed William only after William tried to stop Hughbanks from fleeing. Hughbanks's explanation suggests that he was more a frightened burglar than a cold-blooded killer.

{¶ 135} Hughbanks's explanation is not supported by other facts surrounding the murders. Hughbanks stabbed William 17 times and slit his throat. Moreover, Hughbanks did not flee after killing William. Instead, Hughbanks chased

Juanita Leeman as she tried to escape, and, after catching her, slit her throat. The facts establish two horrific murders that lack any mitigating features.

{¶ 136} We find that Hughbanks's history and background provide some mitigating factors. Hughbanks was raised in an abusive and dysfunctional family. Moreover, Gary Sr.'s financial problems had a serious impact on the family while Hughbanks was growing up.

{¶ 137} Mental illness affected many members of Hughbanks's family. His father was a paranoid schizophrenic, his mother suffered mental problems, and his uncle was treated for paranoid schizophrenia. Undoubtedly, the mental illness of these family members adversely affected Hughbanks's growth and development.

{¶ 138} Almost ten years passed between the murders and Hughbanks's arrest for the murders. During this time, Hughbanks was briefly married to one woman and lived with two other women. According to his mother, Hughbanks was the father of a number of children. Little information was disclosed about Hughbanks's work history between 1987 and 1997.

{¶ 139} The following statutory mitigating factors are inapplicable here: R.C. 2929.04(B)(1) (victim inducement), (B)(2) ("duress, coercion, or strong provocation"), (B)(5) (lack of a criminal record), and (B)(6) (accomplice only).

{¶ 140} The R.C. 2929.04(B)(4) factor is entitled to some weight, since Hughbanks was 20 years old at the time of the murders. See *State v. Baston* (1999), 85 Ohio St.3d 418, 431, 709 N.E.2d 128.

{¶ 141} Hughbanks's mental illness does not qualify as an R.C. 2929.04(B)(3) factor. Dr. DeSilva diagnosed Hughbanks with a schizoaffective disorder and a bipolar disorder. Hughbanks's mental problems necessitated hospitalization in the 1980s prior to his commission of the Leeman murders. However, psychiatric testimony failed to establish that Hughbanks lacked substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law at the time the murders were committed. Moreover, Dr. Schmidtgoessling insisted that Hughbanks suffered only from a personality disorder and substance abuse. See *State v. Allard* (1996), 75 Ohio St.3d 482, 502, 663 N.E.2d 1277 (bipolar disorder did not qualify as an R.C. 2929.04[B][3] factor absent testimony that the defendant lacked substantial capacity to conform his conduct to the requirements of the law). There was no evidence that Hughbanks is mentally retarded; intelligence testing showed that he has an IQ of 82.

{¶ 142} Nevertheless, we give considerable weight to Hughbanks's mental illness as another relevant mitigating factor under R.C. 2929.04(B)(7). See *State v. Seiber* (1990), 56 Ohio St.3d 4, 8–9, 564 N.E.2d 408 (lifelong mental illness involving psychotic lapses and paranoid ideation as one of the mitigating "other

factors"). Moreover, Hughbanks's hospitalization and treatment for his psychiatric problems occurred near the time of the offenses in the 1980s. Hughbanks's mental condition may have improved; that fact would help to explain Dr. Schmidtgoessling's 1997 diagnosis and evaluation.

{¶ 143} Hughbanks's expressions of remorse during his unsworn statement are entitled to weight under R.C. 2929.04(B)(7). See *State v. Stallings* (2000), 89 Ohio St.3d 280, 300, 731 N.E.2d 159; *State v. White* (1999), 85 Ohio St.3d 433, 456, 709 N.E.2d 140.

{¶ 144} In summary, we find that Hughbanks's youth, his family background, his mental illness, and his remorse are entitled to some weight in mitigation. Even so, we conclude that the aggravating circumstances in each count outweigh the mitigating factors beyond a reasonable doubt. Hughbanks's course of conduct in multiple killings during the course of burglarizing the Leeman home is a grave aggravating circumstance. Hughbanks's mitigating evidence pales in significance when compared with the aggravating circumstances.

{¶ 145} Finally, we find that the death sentence is proportionate when compared with other "course of conduct" murders. See *Tibbetts*, 92 Ohio St.3d at 174, 749 N.E.2d 226; *State v. Hessler* (2000), 90 Ohio St.3d 108, 131, 734 N.E.2d 1237; *State v. Cornwell* (1999), 86 Ohio St.3d 560, 574, 715 N.E.2d 1144. The death sentence is also proportionate with the sentence imposed in other aggravated-burglary murders. See *State v. Jones* (2000), 90 Ohio St.3d 403, 423, 739 N.E.2d 300; *State v. Campbell* (1994), 69 Ohio St.3d 38, 56, 630 N.E.2d 339; *State v. Landrum* (1990), 53 Ohio St.3d 107, 126, 559 N.E.2d 710.

{¶ 146} Accordingly, we affirm the defendant's convictions and sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PETREE, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

CHARLES R. PETREE, J., of the Tenth Appellate District, sitting for COOK, J.

---

Michael K. Allen, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr., Assistant Prosecuting Attorney, for appellee.

Faulkner & Tepe, L.L.P., A. Norman Aubin and Herbert E. Freeman, for appellant.