OPINION.
{¶ 1} In 11 assignments of error, defendant-appellant Immanuel Dubose claims that he was improperly convicted of felony murder, with a three-year gun specification, and having a weapon while under a disability.[1] For the following reasons, the arguments are without merit and his convictions are affirmed.
 Shootout Results in Death {¶ 2} On July 20, 2006, a shootout between Azizuddin Sanders and others resulted in the death of Sanders. Sanders was killed in the Walnut Hills area of Cincinnati.
 {¶ 3} Carin Allen was at the scene of the shooting and was injured by gunfire. She knew Dubose because she had gone to high school with him. At trial, she testified that Dubose was at the scene of the shooting, but would not say that she had seen him participate in the shootout.
 {¶ 4} Antonio McBride also testified at trial. He was a co-defendant who reached a plea agreement with the state, in this and other cases, in exchange for his testimony. He testified that he went to a party on the night of the shooting. Dubose and Qaid Salaam, another co-defendant, were also there. According to McBride, the three men decided to find Dubose's usual drug supplier and rob him. He said that he knew that both Salaam and Dubose were armed. He said that the three of them left the party to buy drugs. *Page 3 
 {¶ 5} The three men drove to Walnut Hills, but could not find Dubose's usual drug supplier. The group came upon another group of men that included Sanders. According to McBride, Salaam had words with Sanders. When Sanders became "disrespectful," Salaam drew his weapon and pointed it at Sanders. Sanders raised his hands, but then ran into the street. Salaam began shooting at him. McBride said that he dove for cover and that he saw Dubose also begin shooting at Sanders. Sanders drew his own weapon and began shooting at Salaam and Dubose. Sanders was shot and died later at the hospital.
 {¶ 6} A witness at the scene identified a car that was seen leaving the location of the shooting. The investigation later indicated that it was a car that was often borrowed by, among others, Dubose. Telephone records were admitted to connect the witness to Dubose on the night before and the night of the shooting. The owner of the vehicle remembered lending the car to Dubose around the time of the shooting.
 {¶ 7} Detective Keith Witherell testified that he was the lead detective in the case. He interviewed Allen on the night of the shooting, but she was only able to give a general description of the shooters. Cincinnati Police received five tips from the Crime-stoppers hotline, but determined that only one of them was credible. That call linked Dubose to the shooting. Allen was later shown a photo array that included Dubose's photograph, but she denied recognizing anyone.
 {¶ 8} Witherell stated that he later received a call from the victim's family, during which he was told that Allen had told them that she had recognized Dubose and that she was afraid to say anything because she lived and worked near the scene of the shooting. Witherell went to Allen's home and told her about the call he had received. *Page 4 
According to his testimony, she admitted that she had initially lied about not recognizing Dubose because of her fear of retaliation.
 {¶ 9} Dubose was interviewed by police. Initially he agreed to speak to them and asked them if he could avoid prison time if he was a witness. After a brief period, he invoked his right to counsel and questioning ceased.
 {¶ 10} Only Sanders's gun was found at the scene, but analysis indicated that three separate guns were involved in the shootout. No physical evidence was found linking either Dubose or Salaam to the shooting.
 {¶ 11} Dubose was indicted for aggravated murder, [2] murder, [3]
felony murder, [4] aggravated robbery, [5] robbery, [6] and having a weapon while under a disability.[7] Dubose was tried with Salaam, who was indicted on the same charges, except for the weapons-under-disability charge. At the conclusion of the trial, the jury only found him guilty of felony murder and having a weapon while under a disability. He was sentenced to the maximum term for each offense and ordered to serve the terms consecutively. His total prison term was 23 years to life in prison.
 {¶ 12} On appeal, he has raised 11 assignments of error. For ease of analysis, we discuss the assignments of error out of order.
 Colon I, Colon II, and Felony Murder {¶ 13} In his eleventh assignment of error, Dubose argues that since the indictment in this case failed to include a required mens rea element for the felony-murder *Page 5 
charge, the indictment was defective and gave rise to structural error under the recent Ohio Supreme Court decision in State v.Colon.[8] We disagree.
 {¶ 14} The indictment in this case alleged that Dubose had "caused the death of AZIZUDDIN SANDERS as a proximate result of the defendant committing or attempting to commit an offense of violence, to wit: FELONIOUS ASSAULT, which is a felony of the Second Degree that is not a violation of 2903.03 or 2903.04 of the Revised Code, in violation of Section 2903.02(B) of the Ohio Revised Code * * *."
 {¶ 15} In State v. Colon (Colon I), the court concluded that an indictment that failed to state the mensrea of recklessly for robbery resulted in structural error.[9] That decision was clarified by the court in a subsequent decision (Colon II).[10] In that case, the court noted that "[i]n a defective-indictment case that does not result in multiple errors that are inextricably linked to the flawed indictment such as those that occurred in Colon I, structural-error analysis would not be appropriate. As we stated in Colon I, when a defendant fails to object to an indictment that is defective because the indictment did not include an essential element of the charged offense, a plain-error analysis is appropriate."[11]
 {¶ 16} In Colon II, the court noted that, in addition to the omission in the indictment, the proceedings suffered from the following defects: (1) there was no evidence to show that the defendant had notice that recklessness was an element of the crime of robbery; (2) there was no evidence that the state had argued that the defendant's conduct was reckless; (3) the trial court did not include recklessness as an *Page 6 
element of the crime when it instructed the jury; and (4) the prosecuting attorney had treated robbery as a strict-liability offense in closing argument.[12]
 {¶ 17} Colon I noted that "the mental state of the offender is part of every criminal offense in Ohio, except those that plainly impose strict liability."[13] But felony murder is one of the few crimes in Ohio that has no mens rea element directly attached to it. The mens rea element is found in the predicate offense and does not arise from the catchall culpable mental state of recklessly found in R.C. 2901.21(B). As the Ninth Appellate District recently noted, "a person commits felony murder pursuant to R.C. 2903.02(B) by proximately causing another's death while possessing the mens rea element set forth in the underlying first or second degree felony offense of violence. In other words, the predicate offense contains the mens rea element of the felony murder."[14]
 {¶ 18} When the Ohio Supreme Court first addressed the then-new felony-murder statute, it concluded that, "[i]n reversing the felony murder conviction, the court of appeals critically misconstrued the standard of mens rea necessary to commit felony murder. Felonious assault is defined as knowingly causing, or attempting to cause, physical harm to another by means of a deadly weapon. * * * If defendant knowingly caused physical harm to his wife by firing the gun at her through a holster at close range, he is guilty of felonious assault. The fact that she died from her injuries makes him guilty of felony murder,regardless of his purpose."[15] The Tenth Appellate District likewise concluded that the "intent to kill is *Page 7 
conclusively presumed as long as the state proves the required intent to commit the underlying felony * * *."[16]
 {¶ 19} So where, as here, felony murder is charged with a predicate offense of felonious assault, the state must prove that the defendant directly and proximately caused the death of another whileknowingly causing serious physical harm or knowingly causing or attempting to cause physical harm by means of a deadly weapon or dangerous ordnance.[17]
 {¶ 20} In his brief, admittedly submitted prior to the release ofColon II, the only error Dubose cites is the absence of the mens rea element in the indictment. He does not assert (1) that he was unaware of the mens rea element for the charge against him, (2) that the state argued the incorrect mens rea, or (3) that the trial court improperly instructed the jury.
 {¶ 21} We have independently reviewed the record and conclude that none of these errors were present. First, the state correctly explained felony murder as follows: "Now this murder is going to sound different to you than the one we just talked about. There are different elements here, * * * but this one states that they caused the death, and you'll note you don't see the word `knowingly' or `purposefully' yet, as a proximate result of committing or attempting to commit an offense of violence, of felonious assault.
* * *
 {¶ 22} "If you can find there was a felonious assault, and the fact that there was a proximate death as a result of it, then you found Count 3 in the indictment. * * * Immanuel Dubose and Qaid Salaam, on July 20th, same date, time, and place, *Page 8 
knowingly caused or attempted to cause physical harm to Azizuddin Sanders. Further states `by means of a deadly weapon,' or a handgun. * * * You are going to have to consider a different mental state here. Ant that mental state is `knowingly.' And did the defendants act knowingly when they pointed a gun at Mr. Sanders and fired. * * *
 {¶ 23} "They had an awareness of that probability, that firing a gun would or could inflict serious physical harm on Dean Sanders, when, in fact, that's exactly what happened. And once you make the finding here that there was a felonious assault and as a result of the felonious assault someone is now dead, then you find that the defendants committed the offense of murder as charged in Count 3 of the indictment."
 {¶ 24} Second, we note that the trial court improperly instructed the jury that felony murder required a showing that the "defendant purposefully caused the death of Azizuddin Sanders, as a proximate result of * * * committing or attempting to commit felonious assault." But adding the purposeful element only served to heighten the state's burden and inured to the benefit of Dubose.
 {¶ 25} After reviewing the record, we conclude that the failure to expressly include a mens rea element in the indictment for felony murder in this case did not lead to errors that "permeate[d] the trial from beginning to end and put into question the reliability of the trial court in serving its function as a vehicle for determination of guilt or innocence."[18] Therefore, pursuant to Colon II, any mistake in the indictment did not rise to the level of structural error. As required, we now examine any defect in the indictment on a plain-error basis. *Page 9 
 No Plain Error {¶ 26} Crim. R. 52(B) permits a reviewing court to take notice of "[p]lain errors or defects affecting substantial rights" even if a party forfeits an error by failing to object to the error at trial.[19] To correct a plain error, (1) there must be an error, i.e., a deviation from a legal rule; (2) the error must be plain, i.e., an "obvious" defect in the trial proceedings; and (3) the error must have affected substantial rights to the extent that it affected the outcome of the trial.[20] Courts are to take notice of plain error "only to prevent a manifest miscarriage of justice."[21]
 {¶ 27} We cannot conclude in this case that any omission in the indictment was a plain or obvious defect in the trial proceedings. Since felony murder takes its mens rea element from the predicate offense, the indictment would only have been faulty if the failure to list the elements of the predicate offense rendered it so.
 {¶ 28} In State v. Childs, the foundational decision for the holding in Colon I regarding the constitutional requirements of an indictment, the defendant was charged with conspiracy relating to drug trafficking.[22] But the indictment that charged the conspiracy count did not name the drug that was the object of the conspiracy.[23] After discussing the constitutional requirements of an indictment-later quoted by the Colon I majority — the Childs court concluded that "[w]here the offense at issue is charged as a conspiracy, it is well established that it is the elements of the conspiracy that must be provided: Conspiring to commit a crime is an offense *Page 10 
wholly separate from the crime, which is the object of the conspiracy. Thus, we have consistently held that a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit."[24]
 {¶ 29} The court later amplified its position in State v.Buehner, [25] stating that, in the context of ethnic intimidation,"it is the predicate offense itself and not the elements of the predicate offense that is an essential element of the chargedoffense."[26] In Buehner, the court noted that it had "previously rejected the argument that an indictment is defective for the state's failure to identify the elements of the underlying offense of the charged crime."[27] The Buehner court held that "[a]n indictment that tracks the language of the charged offense and identifies a predicate offense by reference to the statute number need not also include each element of the predicate offense in the indictment."
 {¶ 30} In this case, the indictment did not indicate the predicate offense by statute number, but by the name of the offense: felonious assault. The question we must then answer is whether this distinction is meaningful. It is not.
 {¶ 31} Since the statute number was present in Buehner, it was not necessary for the court to consider whether another form of reference — such as reference to the offense by name — would have been sufficient. The court did note that the "purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same offense."[28] The court also noted that "an indictment `may *Page 11 
be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give thedefendant notice of all the elements of the offense with which thedefendant is charged.' "[29] Given this language, one could readBuehner for the proposition that "words sufficient to give the defendant notice" include reference to the Revised Code by the name of the offense rather than by the section number. We fail to see any meaningful difference between an indictment that says "R.C. 2903.11" and one that says "felonious assault."
 {¶ 32} Since naming the predicate offense is sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged, it follows that the omission complained of in this case was not a plain or obvious defect in the trial proceedings. While it would have been better either to have listed the section number for felonious assault in the indictment, bringing this case into literal compliance with Buehner, or to have charged felonious assault separately, [30] the failure to do either did not render the indictment invalid.
 {¶ 33} But even if we were to conclude that the failure to list the mens rea element was error, and that this error was plain, the record does not support the conclusion that it affected Dubose's substantial rights to the extent that it affected the outcome of the trial. The prosecution properly argued what it had to prove to establish that Dubose had committed felony murder. And while the trial court *Page 12 
improperly instructed the jury that the state had the additional burden of proving a purposeful killing, this mistake benefitted Dubose. On this record, we cannot conclude that the outcome of the trial would have been different had a mens rea element been alleged in the indictment.
 {¶ 34} Dubose's eleventh assignment of error is overruled.
 Motion to Suppress Statement {¶ 35} In his eighth assignment of error, Dubose claims, without citation to the record, that his statements should have been suppressed because "it appeared that Mr. Dubose continued to be questioned by police even after he asked for a lawyer." But, as the state points out, Dubose was questioned for 20 to 25 minutes and then asked to call his lawyer "before making a decision in terms of cooperating or giving a statement." Witherell testified that "when he requested an attorney, we stopped the interview." Dubose points to nothing in the record indicating that questioning did not cease once Dubose invoked his right to counsel.
 {¶ 36} Dubose's eighth assignment of error is overruled.
 Motion to Suppress Identification Testimony {¶ 37} In his seventh assignment of error, Dubose claims that the process the police used to obtain an identification from a witness in this case was unduly suggestive and that the subsequent identification testimony should have been suppressed. We disagree.
 {¶ 38} During the suppression hearing, Witherell stated that Allen was first shown a photographic array that included a photograph of Dubose on August 1, 2008. *Page 13 
She told him that she did not recognize anyone. She was recalled to the homicide unit on August 30 after the victim's family had contacted Witherell and told him that Allen had said that one of the gunmen had been in the array, but that she was afraid to identify him. During the second interview, Witherell confronted Allen with the information he had received from the victim's family. She admitted to Witherell that she had made that statement to the family. She did not identify Dubose initially because she feared retaliation. She then agreed to re-examine the array. She was shown the same photographs she had seen on August 1 and indicated that she recognized Dubose's photograph as depicting one of the shooters. She told Witherell that she had gone to high school with Dubose and had known him "for some time prior to this offense."
 {¶ 39} When Allen was called to testify, she indicated to the court that she did not want to testify. The trial court called her, pursuant to EvidR. 614, as a court witness. She refused to cooperate with the questioning, claiming that she had put her head down when the shooting started and that she could identify no one. She claimed that Witherell had told her to identify Dubose.
 {¶ 40} Dubose argues that Allen identified him in the second array "only after the police accused her of lying to them. This was impermissibly suggestive and resulted in an unreliable and inadmissible identification of Mr. Dubose." We disagree.
 {¶ 41} While we conclude that simply telling a witness that she is lying, without indicating that she is lying about a particularphotograph, is not impermissibly suggestive, we have held that "even an unnecessarily suggestive identification process does not violate a defendant's due-process rights unless it can also be shown that the *Page 14 
resulting identification lacked sufficient indicia of reliability. "[31] The most overtly suggestive process will not be grounds for suppression "where the witness had more than ample opportunity to view the suspect, or perhaps already knew the suspect, * * * and was certain in his or her identification. "[32]
 {¶ 42} In this case, even while Allen tried to distance herself from her prior identification of Dubose, she admitted that she had known him from high school. Prior to making its decision on the motion, the trial court noted that "one of the advantages of a trial judge, you have the opportunity to see a witness, to hear him or her testify, to see the things at the time you testify." The trial court's decision to believe the state's version of how the second identification had proceeded was a credibility determination that it, alone, was empowered to make.
 {¶ 43} Dubose's seventh assignment of error is overruled.
 Motion for Separate Trials {¶ 44} In his ninth assignment of error, Dubose claims that the trial court abused its discretion when it did not grant his request to be tried separately from his codefendant, Quad Salaam. We disagree.
 {¶ 45} Joinder of codefendants for trial is proper when they acted in concert and participated in the same criminal enterprise, the same series of acts or transactions, or the same course of criminal conduct.[33] An accused may move for separate trials under Crim. R. 14, but has the burden to affirmatively demonstrate that his rights to a *Page 15 
fair trial would be prejudiced by the joinder.[34] For an appellate court to reverse a trial court's ruling denying severance, the defendant must demonstrate that the trial court abused its discretion.[35]
 {¶ 46} In this case, Dubose argues that "such injustice occurred in the case at bar because the trial court overruled Mr. Dubose's motion for a separate trial." The fact that the motion was denied, with nothing more, does not demonstrate prejudice.
 {¶ 47} Dubose's ninth assignment of error is overruled.
 State's Impeachment of Allen {¶ 48} In his third assignment of error, Dubose claims that the trial court abused its discretion when it allowed the state to impeach its own witness with her prior statement without showing surprise and affirmative damage. We disagree.
 {¶ 49} When Allen was called to testify at the suppression hearing, her hostility became immediately apparent. She initially refused to come forward and, after that, refused to answer any questions or to participate in the proceedings. The hearing was recessed until the following morning. When the hearing resumed, the trial court recessed to have a representative of the Hamilton County Public Defender's office confer with Allen with regard to her obligation while under subpoena in this case. The trial court granted the state's request that Allen be declared a court's witness pursuant to Evid. R. 614.
 {¶ 50} The trial commenced that afternoon and Allen was called to testify the next day. After some initial questioning, the state identified an exhibit, State's Exhibit *Page 16 
25, that seems to have been a tape recording of the statement Allen had made to police.[36] Defense counsel objected, claiming that the state was trying to impeach its own witness with a prior inconsistent statement, in violation of Evid.R 607(A). The state responded that it believed that Allen was still the court's witness. Counsel responded that she was only a court's witness for purposes of the suppression hearing. The following exchange then took place:
 {¶ 51} "Ms. Burroughs: Well, then, Judge, in that case the state would be asking at this time, I thought we had made it quite clear, that as we proceeded through all of this, that we've had an issue with this witness, she has been difficult, she —
 {¶ 52} "The Court: I find that she is a hostile witness. Go ahead.
 {¶ 53} "Ms. Burroughs: And the State would be asking that the Court call the witness pursuant to Evidence Rule 614.
 {¶ 54} "Ms. Rabanus: Judge, under that, that allows her to use leading questions, that doesn't necessarily allow her to use a tape of that.
 {¶ 55} "The Court: No, but it allows her to treat her as a hostile witness.
 {¶ 56} "Ms. Rabanus: Correct, correct. What she is trying to do is use a prior unsworn statement."
 {¶ 57} After some further discussion, the state was permitted to resume its examination.
 {¶ 58} Having reviewed the examination conducted by the state of Allen, we conclude that the trial court still considered Allen a court's witness at the time of trial. The purpose of calling a witness as a court's witness is to allow for a proper *Page 17 
determination in a case where a witness is reluctant to testify.[37]
A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal candidate for the application of EvidR. 614.3[38] The prime candidate is a victim and an eyewitness who will not cooperate with the party originally planning to call him.[39]
 {¶ 59} The benefit of designating a witness as a court's witness is that the witness can be cross-examined by any party.[40] Once that determination has been made, the restriction found in EvidR. 607, relating to impeaching a party's own witness with a prior inconsistent statement, does not apply.[41] Under these circumstances, the party is not required to show surprise before proceeding with cross-examination.[42]
 {¶ 60} This court has not found a single case that stands for the proposition that designating an individual as a court's witness lasts for only a limited period of time or applies only to the hearing at which the determination is made. The reason for this is simple. There is no reason to designate a witness as a court's witness for a pretrial suppression hearing. The Ohio Rules of Evidence do not apply to suppression hearings.[43] In view of this, the state can impeach its own witness, or lead a reluctant witness, at a suppression hearing. *Page 18 
 {¶ 61} We conclude that Allen remained a court's witness at the time of trial for the following reasons: (1) the trial court had designated Allen a court's witness the day before the trial began; (2) there was no benefit to designating a witness as a court's witness for the suppression hearing; (3) the trial court observed that Allen was still hostile at the time of trial; (4) there is no legal authority for the proposition that the "court's witness" designation is limited to a single proceeding or period of time; and (5) the trial court apparently decided to allow the state to proceed with Allen as a court's witness. The reference by the trial court to Allen as hostile, while perhaps inartful, does not change this result. What that exchange does make clear is that nothing had changed about Allen's demeanor that would have led the trial court to lift the designation.
 {¶ 62} Even if we were to conclude that Allen was not a court's witness, any error in the questioning was harmless. The lead detective in the case testified about what Allen had told her during the identification process. Additionally, Antonio McBride testified to Dubose's role in the shooting.
 {¶ 63} Dubose's third assignment of error is overruled.
 Disallowing Evidence of Other Crimestopper Tips {¶ 64} In his second assignment of error, Dubose claims that the trial court improperly limited his cross-examination of the investigating detective about other tips that pointed to other suspects. We disagree.
 {¶ 65} "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such *Page 19 
exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion."[44]
 {¶ 66} The record indicates that police acted on one of five Crimestoppers tips that specifically linked Dubose to the shooting. Detective Witherell indicated that the other leads did not contain sufficient detail or match other facts known about the shooting to warrant further investigation. But counsel was permitted to ask about the number of other tips, the time and date of the calls, and the substance of what had been said. Counsel was only prevented from eliciting the identities or descriptions of the people who were named by the anonymous callers. This limitation on cross-examination was not an abuse of discretion.
 {¶ 67} Dubose's second assignment of error is overruled.
 Introduction of Taped Statement as Rebuttal Evidence {¶ 68} In his first assignment of error, Dubose claims that it was improper to allow the state to play a recorded telephone conversation between Dubose and another party during the rebuttal phase of the trial. The taped conversation indicated that Dubose had fired a gun in the past. Dubose claims that the evidence was not proper rebuttal evidence, that the tape was not properly authenticated or identified, and that he had not been informed of the tape's existence prior to trial.
 {¶ 69} The admission or exclusion of testimony from a rebuttal witness rests within the sound discretion of the trial court.[45] An appellate court will not disturb such a *Page 20 
ruling absent an abuse of discretion.[46] The purpose of a rebuttal witness is to "explain, refute or disprove new facts introduced into evidence by the adverse party[.]"[47] The testimony of a rebuttal witness is only relevant to challenge the evidence introduced by the opponent, and the scope of this testimony is limited to such evidence.[48]
 {¶ 70} While this is a close case, we find no abuse of discretion. During the state's examination of the investigating detective in its case-in-chief, the trial court allowed Dubose to show his hands to the jury, demonstrating that he had no thumbs. During the defense's case, Dubose called as a witness a friend who testified that he had not given Dubose a gun on the night of the shooting, contrary to the testimony of McBride. On cross-examination by the state, the witness testified that he had never seen Dubose hold or fire a handgun. While it was the state that elicited the statement that the witness had never seen Dubose fire a gun, Dubose had placed his ability to do so at issue when he was allowed to show his hands to the jury. On this record, we cannot conclude that it was unreasonable, arbitrary, or unconscionable to allow the jury to hear the tape.
 {¶ 71} As to the issue regarding authentication and identification, we find no error. The technician who had recorded the conversation identified the tape, and Witherell identified Dubose's voice from his prior conversations with Dubose. It was not an abuse of discretion to allow the playing of the tape.
 {¶ 72} As to the argument that Dubose did not know about the tape prior to trial, we likewise find no error. According to the transcript, the state did not intend to use the tape until Dubose was allowed to show his hands to the jury. The existence of *Page 21 
the recording and its likely use were disclosed shortly thereafter. The Ohio Supreme Court has held that it is improper to reverse a conviction when the defendant should not have been surprised by the rebuttal witness's testimony as it concerned a statement that the defendant had allegedly made.[49] Further, in the absence of a motion for a continuance, "the trial court properly concluded that defense counsel was prepared to go forward at that time."[50]
 {¶ 73} Even if we were to conclude that the decision to allow the rebuttal evidence was error, it was harmless. The taped conversation was played to the jury, but the tape was not admitted into evidence, and the jury did not hear it again. Additionally, other testimony was offered by the state indicating that Dubose was capable of firing a gun.
 {¶ 74} Dubose's first assignment of error is overruled.
 Sufficiency and Weight of the Evidence {¶ 75} In his fourth assignment of error, Dubose claims that his conviction was based upon insufficient evidence. In his fifth assignment of error, he claims that the conviction was against the manifest weight of the evidence. In his sixth assignment of error, he argues that the trial court improperly denied his Crim. R. 29 motion for an acquittal. All three assignments are without merit.
 {¶ 76} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable *Page 22 
doubt.[51] The standard of review for the denial of a Crim. R. 29(A) motion to acquit is the same.[52] In a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[53]
 {¶ 77} The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of fact to resolve.[54]
"Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. "[55]
 {¶ 78} "It is the State's burden at trial to prove the criminal charge or charges alleged beyond a reasonable doubt. However, when a convicted defendant argues on appeal that his conviction is against the manifest weight of the evidence, the defendant bears the burden of that proposition. He must show that his conviction is contrary to the weight of the evidence offered, not merely that the probative value of the evidence offered by both sides is in equipoise. In that circumstance, this court will not substitute its judgment for that of the trier of facts on issues such as witness credibility, unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. "[56] *Page 23 
 {¶ 79} In this case, while Allen refused to testify that Dubose was involved in the shooting, she did testify that he was at the scene when the shooting occurred. McBride testified about the plan that he, Dubose, and Salaam had concocted and about how the encounter proceeded. His version of events matched the physical evidence found at the crime scene. The jury was fully informed of McBride's plea agreement with the state and was instructed about the problems that might be inherent in the testimony of a co-conspirator.
 {¶ 80} A rational trier of fact could have found all the essential elements of the crimes beyond a reasonable doubt, and the jury did not lose its way by doing so in this case.
 {¶ 81} Dubose's fourth, fifth, and sixth assignments of error are overruled.
 Sentencing {¶ 82} Finally, Dubose argues that his sentence was contrary to law. We disagree. Dubose was sentenced to the maximum term both for felony murder and for having a weapon under a disability, and the trial court ordered that the terms be served consecutively. As we have stated on numerous occasions, "[t]rial courts have full discretion to impose a sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences."[57] Dubose received the maximum sentences allowed by statute, and because the imposed sentences were within the statutory ranges, his assignment of error is not well taken. *Page 24 
 Conclusion {¶ 83} For the foregoing reasons, we overrule Dubose's 11 assignments of error and affirm the judgment of the trial court.
Judgment affirmed.
SUNDERMANN, P.J., and HENDON, J., concur.
[1] R.C. 2903.02(B) and R.C. 2923.13(A)(3).
[2] R.C. 2903.01(B).
[3] R.C. 2903.02(A).
[4] R.C. 2903.02(B).
[5] R.C. 2911.01(A)(1).
[6] R.C. 2911.02(A)(2).
[7] R.C. 2923.13(A)(3).
[8] 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917.
[9] Id. at 19.
[10] State v. Colon, 2008-Ohio-3749.
[11] Id. at ¶ 7, citing Colon, 118 Ohio St.3d 26, 2008-Ohio-1624,885 N.E.2d 917, at ¶ 23.
[12] Id. at ¶ 6.
[13] Colon I at ¶ 11, citing State v. Lozier, 101 Ohio St.3d 161,2004-Ohio-732, 803 N.E.2d 770, at ¶ 18.
[14] State v. Sandoval, 9th Dist. No. 07CA009276, 2008-Ohio-4402, at ¶ 21.
[15] State v. Miller, 96 Ohio St.3d 384, 2002-Ohio-4931,775 N.E.2d 498, at ¶¶ 31, 33.
[16] State v. Walters, 10th Dist. No 06AP-693, 2007-Ohio-5554, at ¶ 61.
[17] See R.C. 2903.02(B) and 2903.11.
[18] Colon I, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, at ¶ 17.
[19] State v. Payne, 114 Ohio St.3d 502, 2007-Ohio-4642,873 N.E.2d 306, at ¶ 5, quoting Crim. R. 52(B).
[20] State v. Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68,759 N.E.2d 1240.
[21] Payne at ¶ 16, quoting State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph three of the syllabus.
[22] State v. Childs, 88 Ohio St.3d 558, 2000-Ohio-425,728 N.E.2d 379.
[23] Id.
[24] Childs, 88 Ohio St.3d at 565.
[25] 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162.
[26] Id. at ¶ 12 (emphasis added).
[27] Id. at ¶ 10, citing State v. Murphy (1992), 65 Ohio St.3d 554,583, 605 N.E.2d 884.
[28] Buehner at ¶ 7.
[29] Buehner at ¶ 8, quoting Crim. R. 7(B).
[30] See Sandoval at ¶ 23 (omission of mens rea element in felony-murder indictment cured because the defendant was also separately indicted for the underlying felonious assault).
[31] State v. Nix, 1st Dist. No. C-030696, 2004-Ohio-5502, at ¶ 21, citing State v. Brown (1988), 38 Ohio St.3d 305, 310,528 N.E.2d 523.
[32] Id., citing State v. Waddy (1992), 63 Ohio St.3d 424, 439,588 N.E.2d 819.
[33] See State v. Patterson, 2nd Dist. No. 05CA0128, 2007-Ohio-29, at ¶ 30.
[34] Id., citing State v. Lott (1990), 51 Ohio St.3d 160,555 N.E.2d 293.
[35] Id.
[36] The item was not admitted into evidence and is not part of our record.
[37] See State v. Curry, 8th Dist. No. 89075, 2007-Ohio-5721, at ¶ 18.
[38] Id., citing State v. Brewer (Feb. 25, 1986), 10th Dist. No. 84AP-852.
[39] Id.
[40] See Evid. R. 614(A).
[41] See State v. Kiser, 6th Dist. No. S-036-028, 2005-Ohio-2491, at ¶ 15; Curry at ¶ 16, citing State v. Dacons (1982), 5 Ohio App.3d 112,449 N.E.2d 507; see, also, State v. Webb (1994), 70 Ohio St.3d 325, 341,638 N.E.2d 1023 ("Evid. R. 607 requirements are inapplicable to a witness called by the court at the state's request").
[42] Id.; see, also, State v. Black, 5th Dist. No. 2001-CA-00251, 2002-Ohio-2846, at ¶ 15, appeal denied, 96 Ohio St.3d 1524,2002-Ohio-5099, 775 N.E.2d 864; State v. Menefee (Sept. 29, 1995), 10th Dist. No. 95APA03-266.
[43] See Evid. R. 104(A), ("in making its determination [on the admissibility of evidence, the court] is not bound by the rules of evidence except those with respect to privilege"); State v. Boczar,113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, at ¶ 17 ("the Rules of Evidence do not apply to suppression hearings").
[44] State v. Hughbanks, 99 Ohio St.3d 365, 2003-Ohio-4121,792 N.E.2d 1081, at ¶ 88, quoting State v. Acre (1983), 6 Ohio St.3d 140, 145,451 N.E.2d 802.
[45] State v. Finnerty (1989), 45 Ohio St.3d 104, 109,543 N.E.2d 1233.
[46] See id.; State v. Hicks, 6th Dist. No. L-02-1254, 2003-Ohio-4968, at ¶ 11.
[47] State v. McNeill, 83 Ohio St.3d 438, 446, 1998-Ohio-293,700 N.E.2d 596.
[48] Id.
[49] Finnerty, 45 Ohio St.3d at 109.
[50] Id., quoting State v. Edwards (1976), 49 Ohio St.2d 31, 43,358 N.E.2d 1051.
[51] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[52] State v. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.
[53] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[54] State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212.
[55] State v. Lawson (Aug. 22, 1997), 2nd Dist. No. 16288.
[56] State v. Foust, 2nd Dist. No. 20470, 2005-Ohio-440, at ¶ 28.
[57] State v. Traore, 1st Dist. No. C-060802, 2007-Ohio-6334, at ¶ 14, quoting State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470, at ¶ 100. *Page 1